UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MUQARIBU MILES,

    Petitioner,

v.

STEVEN RIVARD,

    Respondent.

Case No. 2:14-cv-11830
Honorable Laurie J. Michelson

**OPINION AND ORDER
DENYING PETITION FOR WRIT OF HABEAS CORPUS [1],
DENYING RESPONDENT'S MOTION TO DISMISS [8], AND
GRANTING PETITIONER A CERTIFICATE OF APPEALABILITY**

    In October 2009, Petitioner Muqaribu Miles had an altercation with Marcel Conner at Rebecca Robinson's home; as a result, Miles was charged with four offenses: home invasion, felonious assault, felon in possession of a firearm, and felony firearm. At Miles' state-court trial on these charges, Conner testified that when he was exiting Robinson's front door onto her porch, Miles jumped him, brandished a gun, said that he did not like snitches, and threatened to kill him. Miles testified differently. Miles said that he simply wanted to talk with Conner and that he did not have a gun with him. The jury convicted Miles of home-invasion but it hung on the three weapons charges.

    After the trial, the prosecutor learned that a copy of Miles' criminal-history report had been inadvertently provided to the jury despite the trial judge's ruling that Miles' prior convictions (save one) would not be admissible at trial. Based on this alleged error, and two others, Miles petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Miles

says that the jury's exposure to his criminal history deprived him of his constitutional right to a fair trial. For the reasons set forth below, the Court will deny Miles' Petition.

## I.

Miles does not claim that the Michigan Court of Appeals' summary of the evidence presented at his trial is inaccurate.[1] In fact, a comparison of his factual summary (Dkt. 2, Br. in Supp. of Pet. at Pg ID 17–27) to that of the state appellate court, *People v. Miles*, No. 302497, 2012 WL 3238834, at *1–6 (Mich. Ct. App. Aug. 9, 2012), reveals that they are largely in accord. So the Court presents the facts as found by the Michigan Court of Appeals with limited supplementation from Miles' brief in support of his Petition.

### A.

The Michigan Court of Appeals summarized the events leading up to the incident at Robinson's house this way:

> Sometime in late September 2009, police stopped a vehicle in Canton Township that was driven by a man named Marcel Conner. According to Conner, [Miles] and Justin Robinson were passengers in the vehicle and when police stopped the vehicle [Miles] fled on foot. Police discovered stolen catalytic converters in the vehicle. During the traffic stop, Conner implicated [Miles] in the crime.
>
> A few days later when Conner was released from jail, [Miles] met Conner at a party store in Jackson where, according to Conner, [Miles] and another man "jumped" Conner and physically beat, kicked, and "stomped" him. [Miles] agreed at trial that he beat Conner "pretty bad" that evening. Conner testified that [Miles]

---

[1] The Court is aware that 28 U.S.C. § 2254(e)(1) provides, "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." But the interplay between 28 U.S.C. §§ 2254(d)(2) and (e)(1) is unsettled. *See Wood v. Allen*, 558 U.S. 290, 293 (2010); *Murray v. Schriro*, 745 F.3d 984, 1001 (9th Cir. 2014); *Rice v. White*, 660 F.3d 242, 254 (6th Cir. 2011). Moreover, as will become apparent below, the Court does not apply AEDPA deference in this case.

2

> was upset that Conner implicated him in the theft; Conner did not report the assault to police.

*Miles*, 2012 WL 3238834, at *1.

The altercation between Miles and Conner that led to Miles' conviction for home invasion occurred on October 3, 2009. The Michigan Court of Appeals summarized the events of that night as follows:

> [O]n October 3, 2009, Conner was at the home of Rebecca Robinson visiting his girlfriend Jennifer Snyder, the mother of two of [Conner's] young children. . . . Later that evening after dark, Conner exited Robinson's home through a door onto a screened-in porch when he was immediately accosted by [Miles]. Specifically, Conner testified that when he exited the home onto the porch, [Miles] "jumped" him while . . . "brandishing" a silver handgun. Conner testified that [Miles] stated that he did not like "snitches" and said "I'm here to get you," and threatened to kill Conner. According to Conner, [Miles] grabbed him and said "come with me" and started pulling him away from the door. [Miles] threatened to kill Conner, and Conner resisted and yelled for help.
>
> Snyder [,Conner's girlfriend,] testified that when Conner exited the home she heard a loud "bang" and immediately heard a child scream and then heard Conner yelling for her. Snyder rushed to the door and saw that [Miles] had a hold of Conner and was pulling him away from the door. A struggle ensued where Snyder grabbed hold of both [Miles] and Conner and tried to pull them apart. According to Snyder, the struggle took place on the enclosed porch and the entryway of the home and both she and Conner testified that [Miles] stepped over the doorstep into the home. Snyder testified that [Miles] pulled a gun out of his pocket and told her to "let go." Snyder testified that she released her hold of [Miles] at that point. According to Snyder, a police car effectuated a traffic stop nearby and [Miles] walked away.
>
> Eva Harrell, a friend of Rebecca [Robinson], testified that she was in another room of the Robinson home that evening when she heard a loud commotion near the door. Harrell testified that she heard someone say the word "gun" and heard a child exclaim "don't shoot my daddy!" [Harrell testified that she also heard Miles say, "If I wanted to hurt him[,] I would have already done it." (Trial Tr. Vol. I at 253–54.)] Harrell stayed in a separate room with her children and did not approach the door.
>
> After [Miles] left the scene, one of Rebecca's children alerted her to the commotion. Rebecca testified that when she came downstairs to investigate,

3

Conner, Snyder, and one of her sons exclaimed that [Miles] had a gun. Rebecca called 911 and the telephone call was played for the jury at trial.

Rebecca [Robinson] testified that a couple weeks before the incident, [in mid-August 2009,] she told defendant not to come over to her home. [Miles testified that he had gone to Rebecca's home to obtain Justin Robinson's number; Miles recalled that during that August 2009 visit he spoke with Justin on Rebecca's phone with Justin saying to Miles, "I told on you." (Trial Tr. Vol. II at 111–12.)] . . . [Miles] denied that Rebecca told him not to return to the home. . . .

[Miles] testified and agreed that he appeared uninvited at Robinson's home after dark on October 3, 2009. [Miles] agreed that he did not give anyone advance notice that he was going to appear at the home that night and he agreed that no one invited him over or gave him permission to approach the home. [Miles] agreed that his presence at the home surprised Conner and he stated that Conner probably screamed because he thought he was going to "get beat up again."

However, [Miles] testified that he went to [Rebecca Robinson's] home because he wanted to talk to Justin [Robinson] and he knew that Justin frequented the home. [Miles] testified that he wanted to explain that the converter theft was only a misdemeanor. [Miles implied that because the catalytic converter charge was, in his view, only a misdemeanor, he was not angry at Conner. (Trial Tr. Vol. II 114–15, 142.) According to Miles, he had met Conner between the time of their fight and the October 3, 2009 incident and told Conner that they were still friends, "it was just a fight yo, and it's over with." (Trial Tr. Vol. II 114–15.)] [In contrast to Conner's testimony that Miles caught Conner as he exited the *home* to the porch, Miles] stated that as he approached the home, Conner happened to be exiting the porch. [Miles] testified that he grabbed Conner's arm and asked him to talk, and he stated that when Conner responded that he did not want to talk, [he] pulled a cellular telephone out of his pocket and handed it to Conner and asked him to call Justin. According to [Miles], Conner screamed and he ended up on the porch struggling with Conner, Snyder and their children. Specifically, [Miles] stated that while he was holding Conner's arm, when Snyder and the children pulled Conner back toward the entrance to the house, this propelled him onto the enclosed porch. [Miles] also testified that Snyder grabbed hold of him. [Miles] testified that he wanted to leave[—"Jennifer, tell your kids to let me go and you let me go so I can get out of here" (Trial Tr. Vol. II at 119)—]but Snyder would not release him so he took his cellular telephone out of his pocket and told her to call [the] police. [Miles] denied that he had a gun.

During his direct testimony, [Miles] stated that he had three prior misdemeanor convictions, an "R & O," and a "couple other thing[s]." On cross-examination, [Miles] agreed that he was a convicted felon and that a felony charge was not a new experience for him.

4

> At trial, the prosecutor introduced a recorded telephone conversation that [Miles] placed to his fiancé Sherry Heard while he was incarcerated [and six days after] . . . his arrest. During the telephone conversation, [Miles] informed Heard that it would be "horrible" for him if Conner testified at trial and that he would "never, ever see the daylight." [Miles] encouraged Heard to talk to Conner's brother because he could make Conner "change his mind." [Miles] testified that during the conversation he [did not want Conner to lie for him (Trial Tr. Vol. II at 121–22),] but wanted Heard to try and convince Conner to tell the truth.

*Miles*, 2012 WL 3238834, at *1–3 (some paragraphing altered).

**B.**

After deliberating for a day-and-half, on June 24, 2010, the jury convicted Miles of first-degree home invasion but could not reach a verdict on the charges of felonious assault, felon in possession of a firearm, and felony firearm. *Miles*, 2012 WL 3238834, at *3. "The trial court accepted the jury's verdict and declared a hung jury with respect to the other three counts." *Id.*

**C.**

"On the day after trial, the prosecutor went into the jury room to retrieve the exhibits. The exhibits were in a stack on a table and the prosecutor noticed that defendant's criminal record was on the top of the stack of exhibits." *Miles*, 2012 WL 3238834, at *3. Miles' record should not have been among the exhibits: prior to trial, the judge had decided that, save for a prior conviction involving false pretenses, none of Miles' other eight felony convictions—(1) malicious destruction of property over $100; (2) carrying a concealed weapon; (3) fleeing and eluding—third degree; (4) resisting and obstructing a police officer; (5) felon in possession of a firearm; (6) malicious destruction of police property; (7) fleeing and eluding—third degree; and (8) felony firearm (Br. in Supp. of Pet. at Pg ID 27)—would be admissible. (*See* Trial. Tr. Vol. I at 6–7.)

5

So "[t]he prosecutor immediately notified the trial court and defense counsel[,] and defense counsel appeared at court that day":

> The prosecutor informed the court that the criminal record must have inadvertently been included with all of the other exhibits. She stated that she was surprised to find the criminal record because she and defense counsel and the trial court spoke with the jurors immediately after the trial and none of the jurors indicated that they were aware of defendant's criminal record. The prosecutor stated that the jurors expressed surprise when she mentioned defendant had a criminal record.

*Miles*, 2012 WL 3238834, at *3. "The trial court indicated that it would address the issue at another hearing[.] . . ." *Id.*

On June 30, 2010, six days after the verdict, "the court reconvened with the prosecutor, defense counsel, and defendant present":

> Defense counsel argued that the criminal record had tainted the jury and prejudiced defendant. The trial court agreed to consider a motion to vacate defendant's conviction, but indicated that it would proceed with sentencing.
>
> Defendant moved for a new trial or to vacate his conviction, arguing that the presence of his criminal record in the jury room denied him his constitutional right to a fair trial. . . .
>
> At a sentencing hearing, the trial court heard oral arguments and then denied defendant's motion. The court found that defendant could not show prejudice where the jurors expressed surprise at defendant's criminal record and where the jury did not convict defendant of the offenses that were most similar to his criminal history.
>
> However, after the trial court sentenced defendant and went off the record, the trial court reconvened and indicated that it had received a telephone message from a juror and had held a conference call with the prosecutor, defense counsel, and the juror. The juror indicated that he telephoned the court after having read a newspaper article about how defendant's criminal record had been inadvertently submitted to the jury. The juror stated that the jury wanted the exhibits to determine whether defendant had a prior felony conviction and that the jury must have missed the fact that the parties[] stipulated to the prior conviction. The trial court indicated that it would hold an evidentiary hearing so that the jurors could testify.

*Miles*, 2012 WL 3238834, at *3 (some paragraphing altered).

### D.

The evidentiary hearing was held on February 8, 2011—more than six months after the jury's verdict. The Michigan Court of Appeals summarized in detail the testimony of each of the 11 jurors who testified at the hearing as follows:

> Juror Olson testified that he was unsure as to what order the jury addressed the charges during deliberation. He indicated that the jury reached a consensus on the home invasion charge, then discussed the other charges and could not agree, and then returned to the home invasion charge and took a final vote. Olson testified that the jury requested all of the exhibits to use as a "reference point," but not as a focus, and stated that [Miles'] criminal record was among the exhibits. Olson testified that he thought the jury was nearing a consensus on the home invasion count when the exhibits were brought into the room and he stated that [Miles'] criminal record was not a focal point of the jury's discussion of the home invasion charge. He stated that when the jury addressed the other charges they "dug deeper" into the exhibits. Olson stated that he "glanced" at [Miles'] criminal record.
>
> Juror Adams testified that he thought the jury started with the home invasion charge then went on to discuss the other charges then returned to the home invasion charge for a "final vote." Adams indicated that he did not recall looking at [Miles'] criminal record, but testified that a couple jurors may have seen the criminal record when they "skimmed through" all the other exhibits. Adams testified that one of the jurors stated that [Miles'] record was not supposed to be in evidence and then the jurors stopped looking at it. Adams testified that he did not recall the jury discussing [Miles'] criminal record during deliberation on the home invasion charge.
>
> Juror Dunnick testified and was unclear regarding the order in which the jury addressed the charges. Dunnick testified that the jury did not look at [Miles'] criminal record in reaching a decision on the home invasion charge. Dunnick testified that she did not recall anyone discussing [Miles'] criminal history and she stated that, other than a photograph, the jury did not pass exhibits around during deliberations.
>
> Juror White testified that the jurors first skipped around in addressing the counts, but then decided to consider the counts in order. White testified that the jury did not initially review the exhibits, or discuss [Miles'] criminal record. White testified that one of the jurors picked up [Miles'] criminal record after the jury

7

decided to convict defendant of home invasion, but she did not recall the document being passed around.

Juror Burns testified that she did not recall the sequence in which the jury discussed the counts. She looked at a photograph exhibit, but did not review any other evidence. Burns testified that when a juror made a comment about [Miles'] criminal record, another juror stated that [Miles'] criminal record was not to be considered and the record was set aside at that point. [Burns also testified that the final vote on the home invasion count was at the end of deliberations but they may have reached a tentative conclusion earlier. (Dkt. 9-16, Evid. Hr'g Tr. at 35–36.)]

Juror Miller, the jury foreman, testified that the jury addressed each charge in sequence. Miller testified that the jury did not learn of [Miles'] criminal record until after it reached a unanimous verdict on the home invasion count. Miller stated that [Miles'] criminal record had no influence over the home invasion conviction because the jury addressed each element of the offense and reached a unanimous agreement as to all the elements. Miller testified that, at one point during deliberations, one of the jurors mentioned [Miles'] prior felony convictions but the other jurors did not express any interest in the criminal record. Miller indicated that the other jurors did not think the criminal record was out of place because it was evidence of a prior felony. Miller testified that he suggested that the jury review [Miles'] criminal record in more detail, but the other jurors rejected that suggestion and indicated that they were supposed to focus on evidence admitted in the courtroom.

Juror Struber testified that the jury decided the home invasion charge before it addressed the other charges. Struber testified that she recalled reviewing testimonies in reaching a conclusion on the home invasion charge. Struber was aware of [Miles'] criminal record but she did not personally review it. Struber testified that two or three jurors looked at [Miles'] criminal record, but ultimately set it aside after deciding that it should not be taken into consideration. Struber testified that someone may have said something about a gun charge but she did not recall specifics about [Miles'] criminal history, other than the fact that it amounted to a "long list."

Juror Davis testified that the jury first considered the home invasion charge and[, although not certain (Evid. Hr'g Tr. at 49),] she did not think that any of the jurors looked at [Miles'] criminal record before deciding to convict him of that charge. Davis testified that [Miles'] criminal record was not brought into the jury room until the second day of deliberations. Davis stated that she looked through the exhibits and saw [Miles'] prior criminal record and informed the other jurors that his criminal history was with the other exhibits. Davis testified that she was surprised at how lengthy [Miles'] criminal history was [and may have commented on the length (Evid. Hr'g Tr. at 49)]. [Davis could not recall what was in Miles'

8

criminal history but thought that there was something about felony assault.] Davis testified that one other juror looked at [Miles'] criminal record but the other jurors stated that they did not care what defendant did before, and that they were not to take [Miles'] history into consideration. Davis did not think that she looked at the prior history before reaching a result on the home invasion charge. . . . Davis testified that, before deliberations began, the jury was aware that defendant had a prior felony for a weapons offense.

Juror Ransom testified that the jury decided the home invasion charge after it could not reach agreement on the other charges. Ransom testified that the jury considered the layout of the house and landscaping when it discussed the home invasion charge. Ransom stated that she looked at [Miles'] criminal history after reaching a verdict on the home invasion charge. However, Ransom indicated that she did not recall the contents of the record because she merely glanced at it and then glanced at it again when someone else was holding it. She did not know how many people looked at the criminal history. Ransom did not recall discussion about the criminal record because one of the jurors stated that the history should not be considered and the jurors set the document aside at that point.

Juror Carpenter testified that the jury debated several of the charges before arriving at a final decision. Carpenter testified that the jury considered exhibits that pertained to the home invasion charge during discussion of that charge. Carpenter testified that after the jury reached a conclusion on the home invasion charge, she heard discussion about [Miles'] prior criminal history on the opposite side of the table but she did not look at the document.

Juror Cornwell testified that the jury discussed all of the charges. He stated that he did not look at [Miles'] criminal record, discuss it with anyone, or hear anyone else discussing it.

*Miles*, 2012 WL 3238834, at *4–6.

### E.

After listening to the jurors' testimony, the trial court again denied Miles' motion for a new trial or to vacate his conviction:

The court reasoned that, before deliberation, the jurors were aware that defendant had a felony conviction because the parties stipulated to that fact during trial. The court found that the jurors "all seemed to be in agreement that [Miles' criminal record] was not a factor in their decision, they pushed those facts aside." The court reasoned that the jury was aware that defendant had a prior felony conviction, yet it did not convict on the felony-firearm charge. The court also

9

> noted that the jury hung on the weapons charges even though [Miles'] prior criminal record included weapons offenses.

*Miles*, 2012 WL 3238834, at *6.

### F.

Miles appealed. A divided panel of the Michigan Court of Appeals affirmed Miles' conviction and sentence. The majority concluded, "[Miles] has failed to show that the presence of his criminal record in the jury room amounted to constitutional error warranting reversal because [Miles] cannot show that there is a direct connection between his criminal record and his conviction of first-degree home invasion." *Miles*, 2012 WL 3238834, at *10. The dissent's view:

> the jury's inability to reach a verdict on the weapons offenses suggests that at least one juror found [Miles'] testimony credible when he denied having a gun. If the jurors had not seen [Miles'] criminal record of malicious behavior, at least one juror may have found [Miles'] description of the home invasion more credible. Defendant denied that he purposefully entered the screened-in porch and denied that he assaulted or intended to assault anyone on the night in question. The jury's exposure to [Miles'] prior criminal record could have affected their determination of the likelihood that he committed home invasion.

*Miles*, 2012 WL 3238834, at *22 (O'Connell, J., dissenting).

Miles took his case to the Michigan Supreme Court, but that Court was "not persuaded" that it should review the questions presented. *People v. Miles*, 824 N.W.2d 566 (Mich. 2013).

### G.

Miles now seeks habeas relief from this Court. In support of his request, he raises the following three claims: (1) that his right to fair trial under the Fourteenth Amendment was violated when the jury was "exposed to an extraneous influence during deliberations, i.e., [his] criminal record"; (2) that insufficient evidence was presented at trial to convict Miles of first-

degree home invasion; and (3) that his sentence was based on facts that the jury did not find beyond a reasonable doubt. (*See* Dkt. 2, Br. in Supp. of Pet. at Pg ID 13.)

## II.

In response to Miles' Petition, Warden Rivard argues that this Court need not reach the merits of Miles' claims because two of Miles' claims are unexhausted, his Petition is thus mixed, and dismissal is therefore required under *Rose v. Lundy*, 455 U.S. 509 (1982). (*See generally*, Dkt. 8, Resp. Mot. to Dismiss.) The Court ultimately does not opine on the merits of the Warden's motion to dismiss. Under 28 U.S.C. § 2254(b)(2), this Court has discretion to proceed to the merits without addressing exhaustion arguments. *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001). It will do so here in the interests of judicial economy and finality of judgments. *See id.*

## III.

### A.

The Court begins with Miles' claim that the jury's exposure to his criminal record warrants a writ of habeas of corpus. And it does so by first assuming, without deciding, that the jury's exposure to Miles' criminal record violated Miles' constitutional rights. The Court elects this analytical route because this extraneous-evidence claim is not "structural" and is thus subject to harmless-error review, *see Oliver v. Quarterman*, 541 F.3d 329, 340–41 (5th Cir. 2008); *Henderson v. Jones*, 214 F. App'x 795, 797 (10th Cir. 2007); *Griffis v. Hurley*, 151 F. App'x 355, 356 (6th Cir. 2005); *Fullwood v. Lee*, 290 F.3d 663, 678–83 (4th Cir. 2002), and because, as will be explained, the jury's limited review of Miles' record was harmless error.

Before explaining why, the Court notes that it does not review the Michigan Court of Appeals' harmless-error determination through the deferential lens of the Antiterrorism and Effective Death Penalty Act. *See* 28 U.S.C. § 2254(d) (providing that a federal court cannot grant

11

habeas relief unless the state court's merits decision was contrary to or an unreasonable application of Supreme Court precedent). True, the Michigan Court of Appeals offered the last explained state-court decision and it applied a harmless-error standard. But the standard it applied— whether "extraneous influences 'created a real and substantial possibility that they could have affected the jury's verdict,'" *People v. Miles*, No. 302497, 2012 WL 3238834, at *10 (Mich. Ct. App. Aug. 9, 2012) (quoting *People v. Budzyn*, 566 N.W.2d 229 (Mich. 1997))—was equivalent to the harmless-constitutional-error standard used on direct review set forth in *Chapman v. California*, 386 U.S. 18 (1967), *see Marino v. Vasquez*, 812 F.2d 499, 504 (9th Cir. 1987). (The Court in *Budzyn* took its harmless-error test from the Ninth Circuit.) On collateral review, courts are to apply the harmless-constitutional-error standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). And *Brecht's* standard (set forth below) is a higher bar for Miles to clear than the one AEDPA sets in this context, i.e., that the Michigan Court of Appeals unreasonably applied *Chapman*. *See Fry v. Pliler*, 551 U.S. 112, 120 (2007) ("[I]t certainly makes no sense to require formal application of both tests (AEDPA/*Chapman* and *Brecht*) when the latter obviously subsumes the former"); *Ruelas v. Wolfenbarger*, 580 F.3d 403, 412 (6th Cir. 2009) ("[In this Circuit] *Brecht* is always the test, and there is no reason to ask both whether the state court 'unreasonably' applied *Chapman* under the AEDPA and, further, whether the constitutional error had a 'substantial and injurious' effect on the jury's verdict. . . . *Fry* held that *Brecht* applies to all cases on collateral review, and a federal habeas court is never required to determine whether a state court's harmless error determination was 'unreasonable'—*Brecht* handles the work on this, too.").

So *Brecht*'s harmless-error standard governs. Under that standard, "[t]he burden for showing an error to be harmless is on the government, though on habeas review judges

independently review the facts supporting the judgment themselves; but the scale, if equal, tips in favor of the defendant." *Ruelas*, 580 F.3d at 413 (internal citation omitted). This Court must ultimately answer this question: did the jury's consideration of Miles' prior convictions "ha[ve] a substantial and injurious effect or influence" on its determination that Miles was guilty of first-degree home invasion? *See Brecht*, 507 U.S. at 623. The Court's answer is "no."

*First*, the jurors testified virtually unanimously that they did not pay much attention to the criminal record during deliberations. Only a few jurors testified that they saw Miles' record. And the Court agrees with the Michigan Court of Appeals that "the jury did not discuss or consider the criminal record in any detail during deliberations." *Miles*, 2012 WL 3238834, at *7. Indeed, when the issue of Miles' record was raised by a juror, others said that the record was not for consideration. And the jury's verdict adds credibility to their testimony. The jury did not convict Miles of the weapons-related charges, despite that Miles' criminal record includes weapons-related convictions. If the jury was inclined to draw the impermissible character inference, it would have most likely drawn it as to the weapons charges.

*Second*, the Court considers the other evidence of guilt in this case. The elements of first-degree home invasion are:

Element One: The defendant either:
    1. breaks and enters a dwelling or
    2. enters a dwelling without permission.

Element Two: The defendant either:
    1. intends when entering to commit a felony, larceny, or assault in the dwelling or
    2. at any time while entering, present in, or exiting the dwelling commits a felony, larceny, or assault.

Element Three: While the defendant is entering, present in, or exiting the dwelling, either:

>                   1. the defendant is armed with a dangerous weapon or
>                   2. another person is lawfully present in the dwelling.

*Miles*, 2012 WL 3238834, at *8. As to the first element, Miles, in his Petition at least, does not dispute that, under Michigan law, an enclosed porch is considered part of a "dwelling." (*See* Br. in Supp. of Pet. at Pg ID 38.) And the Court agrees with the Michigan Court of Appeals that "Conner testified that defendant was inside the enclosed porch when he exited the Robinson home. Snyder also testified that defendant was on the front porch when she arrived at the doorway to help Conner." *Miles*, 2012 WL 3238834, at *8. As to the second element, the Court agrees with the Michigan Court of Appeals that there was substantial evidence of an offensive touching: "Conner testified that [Miles] grabbed him and tried to pull him off the porch. Snyder also testified that she saw defendant holding onto Conner and pulling him. [Miles] admitted that he held onto Conner's arm. . . . [Miles] testified that Conner probably screamed because he thought he was going to 'get beat up again.'" *Id.* at *9. Finally, regarding the third element, the Michigan Court of Appeals correctly concluded that "there was no dispute that Conner, Snyder, and their children were lawfully present at the Robinson home when defendant was there." *Id.* at *9.

*Third*, even absent Miles' record, the jurors knew that Miles was a convicted felon and knew that he also had three prior misdemeanor convictions, a "R & O" (resisting and obstructing), and "a few other things." *Miles*, 2012 WL 3238834, at *7.

*Fourth*, the trial judge "instructed the jury that it was not to consider evidence that the court had excluded and that the jury needed to base its decision 'only on the evidence that was let in and nothing else.'" *Miles*, 2012 WL 3238834, at *10. And the trial judge "instructed the jury that evidence that defendant stipulated to a prior felony conviction was only to be considered for

14

purposes of the felon in possession charge." *Id.* Jurors are presumed to follow instructions. *United States v. Carter*, 236 F.3d 777, 787 (6th Cir. 2001). And, here, as noted, some jurors told others that they were not to use Miles' criminal history in reaching their verdict.

In all, the record does not show that the jury's exposure to Miles' record had a "substantial and injurious effect or influence," *Brecht*, 507 U.S. at 623.

The dissent in the Michigan Court of Appeals does not dissuade this Court from its conclusion. Applying a harmless-error standard equivalent to that set out by the United States Supreme Court in *Chapman*, the dissent concluded that "[t]he jury's exposure to [Miles'] prior criminal record *could have* affected their determination of the likelihood that he committed home invasion." *Miles*, 2012 WL 3238834, at *22 (O'Connell, J.) (emphasis added). But this does not mean that the dissent would have found that the record in fact "had substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 623. As opposed to the *Chapman* standard, under *Brecht*, habeas petitioners are not entitled to relief "unless they can establish that [trial error] resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 637.

Miles will not be granted a writ based on his first habeas claim.

**B.**

The Court next turns to Miles' claim that his sentence (at least in part) runs afoul of the Sixth Amendment because the trial court, in calculating certain Offense Variables relied on a fact "not reflected in the jury verdict or admitted by the defendant." (Br. in Supp. of Pet. at Pg ID 39.) In particular, Miles takes issue with the trial court's score of fifteen points for Offense Variable 1, aggravated use of a weapon, and score of five points for Offense Variable 2, lethal potential of the weapon used or possessed. (*Id.*) Miles points out that because the jury did not

convict him of the three weapons-related charges, it must have credited his testimony that he did not have a gun when he confronted Conner and, thus, the trial-court's scoring was contrary to the jury's verdict. (*See id.*) Miles concedes that "the trial court is allowed to make a ruling that is inconsistent with the findings of the jury" (so long as the ruling is supported by facts established by a preponderance of the evidence). (*Id.*) But he maintains that, because the jury was not "swayed" by the testimony of Conner, Snyder, or Harrell as to his possession of a gun, it was constitutional error for the court not "to set forth additional facts, or at a minimum articulate the specific facts that it used to justify the scoring of the OV weapons offenses." (*Id.* at Pg ID 40.) Because it is not readily apparent that the Michigan Court of Appeals addressed Miles' sentencing argument in the manner he has presented it in his habeas petition, *see People v. Miles*, 2012 WL 3238834, at *17–18, the Court will grant Miles the benefit of de novo review, *see Robinson v. Howes*, 663 F.3d 819, 823 (6th Cir. 2011) ("Claims that were not 'adjudicated on the merits in State court proceedings' receive the pre-AEDPA standard of review: de novo for questions of law (including mixed questions of law and fact), and clear error for questions of fact."); *Davis v. Rapelje*, 33 F. Supp. 3d 849 (E.D. Mich. 2014).

Miles cites not a single case, let alone a decision resting on the Sixth Amendment, concluding that a trial court violates a defendant's rights by failing to "articulate the specific facts that it used to justify the scoring of" offense variables. Miles does cite *Blakely v. Washington*, 542 U.S. 296 (2004), which is in the general vicinity of his claim. But it is not on point. Applying *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Blakely* held that a defendant's Sixth Amendment rights are violated where a trial judge finds a fact not found by the jury to increase the defendant's sentence above a "statutory maximum." *See Blakely*, 542 U.S. at 302–05; *Cunningham v. California*, 549 U.S. 270, 283 (2007) (summarizing *Apprendi* and *Blakely*).

16

But Michigan's indeterminate-sentencing scheme does not give its trial judges the authority to increase a defendant's sentence above a statutory maximum and thus, as the Sixth Circuit has told us, Michigan's scheme does not implicate *Blakely*'s rule. *Montes v. Trombley*, 599 F.3d 490, 496–98 (6th Cir. 2010). More on point is *Williams v. People of State of N.Y.*, 337 U.S. 241 (1949): "*Williams* involved an indeterminate-sentencing regime that allowed a judge (but did not compel him) to rely on facts outside the trial record in determining whether to sentence a defendant to death. The judge could have sentenced [the defendant] to death giving no reason at all," *Blakely*, 542 U.S. at 305 (citations to *Williams* omitted).

The Court will not grant Miles a writ of habeas corpus based on his erroneous-sentencing claim.

## C.

Last, the Court turns to Miles' claim that he is entitled to a writ of habeas corpus because there was insufficient evidence for a jury to find him guilty of first-degree home invasion beyond a reasonable doubt. As the Warden argues in his motion to dismiss, it appears that Miles' sufficiency-of-evidence claim as presented in his Petition differs from that presented to the Michigan Court of Appeals. (*See* Resp.'s Mot. to Dismiss at ¶ 7.) So the Court will again give Miles the benefit of de novo review.

To prevail on a sufficiency-of-evidence claim, Miles must show that "after viewing the evidence in the light most favorable to the prosecution, . . . no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Parker v. Renico*, 506 F.3d 444, 448 (6th Cir. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)).

Miles has not carried his burden. He argues, without citing authority, "The same facts and elements of the charges of felonious assault, felony firearm, and felon in possession, comprise the essential elements of first degree home invasion. Those three elements were not met in this case either individually or collectively. This is because the jury did not find him guilty on the assault charge, nor did they find guilt on the weapons charges. Consequently, there was insufficient evidence to sustain a finding of guilt on the charge of home invasion." (Br. in Supp. of Pet. at Pg ID 38.) As an initial matter, Miles has not established his premise. The third element of first-degree home-invasion can be satisfied by either a showing that "the defendant is armed with a dangerous weapon *or* another person is lawfully present in the dwelling." *Miles*, 2012 WL 3238834, at *8 (emphasis added). Thus the jury could have found that Miles did not have a weapon, thus absolving him of the weapons charges, but that Miles entered a dwelling while another person was lawfully there and thus was guilty of home invasion. And even granting Miles his doubtful premise, that the elements of first-degree home invasion overlap those of the weapons charges such that a failure to convict on the latter precludes a conviction of the former, Miles' conclusion still does not follow. Simply because his particular jury was hung on the weapons charges does not show that—after taking the evidence in the light most favorable to the *prosecution*—"*no* rational trier of fact *could have* found the essential elements of the crime beyond a reasonable doubt," *Parker*, 506 F.3d at 448. And, in all events, the summary of evidence presented at the outset of this opinion more than shows that some reasonable jury could have convicted Miles of first-degree home invasion.

Miles' sufficiency-of-the-evidence claim does not warrant habeas relief.

## IV.

For the foregoing reasons, the Court DENIES Miles' petition for habeas corpus (Dkt. 1) and Rivard's motion to dismiss (Dkt. 8) is DENIED AS MOOT.

The Court finds, however, that reasonable jurists could debate this Court's decision on Miles' extraneous-evidence claim. In particular, a reasonable jurist could find that jury's exposure to Miles' criminal record was not harmless under *Brecht*. So the Court will grant Miles a certificate of appealability as to that claim. *See Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000). The certificate is not granted as to Miles' other two claims for habeas relief.

A separate judgment will follow.

SO ORDERED.

                              s/Laurie J. Michelson
                              LAURIE J. MICHELSON
                              UNITED STATES DISTRICT JUDGE

Dated: April 29, 2015

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on April 29, 2015.

                              s/Jane Johnson
                              Case Manager to
                              Honorable Laurie J. Michelson